ALBRITTON *v.* THE STATE.

No. 8941. November 17, 1932.

*J. A. Drake* and *J. T. Goree*, for plaintiff in error.

*George M. Napier, attorney-general, B. T. Castellow, solicitor-general, T. R. Gress, assistant attorney-general,* and *Bond Almand,* contra.

BELL, J. Joe Albritton, Guy Long, Jack Long, and Joe Brown Kirkland were jointly indicted for the murder of Lucy Scott, by shooting her with a shotgun and with some firearm, a description of which was unknown to the grand jurors. Upon a separate trial of Joe Albritton, the jury returned a verdict finding the defendant guilty and recommending him to life imprisonment. The defendant moved for a new trial upon the general grounds and upon several special grounds. His motion was overruled, and he excepted.

The following is a summary of the evidence: The deceased Lucy Scott lived on a farm with her son John Scott and his wife. John Scott and Guy Long had had some unpleasant differences, including a fight which occurred a day or so before the homicide. Lucy Scott was killed at about eight o'clock at night. On the afternoon of the same day, Joe Albritton, Guy Long, Jack Long, and another were seen riding together in a Hudson automobile. Several witnesses testified to having seen them at different places within a few miles of the home of John Scott. They stopped at one place where Jack Long borrowed a pistol, and at another place where he borrowed a rifle. These weapons were returned by the borrower to

their owners respectively at a late hour during the night of the killing. One witness testified, in effect, that about four hours before the homicide Joe Albritton, Guy Long, and a cousin of the latter came in an automobile to the place where the witness was working, and that Guy Long got out of the car and came to witness and stated that something had to be done with John Scott, and that he, Long, had decided that he "would get up a bunch and attend to his case." The witness was requested by Long to go with him and others that night and to carry a shotgun. During this conversation Albritton was waiting in the car about 19 steps away.

John Scott was sworn as a witness for the State, and testified that shortly after dark, while in his back yard, he was fired upon by some one with a gun, whom he recognized to be Jack Long. He then ran to the front porch and discovered that several men were about the place—five in all. He recognized four of them, Jack Long, Guy Long, Joe Albritton, and Joe Brown Kirkland. His mother at this time was on the front porch, and was pushing him back into the house, while the men "were shooting rapidly." This witness further testified: "Joe Albritton shot and killed [Lucy Scott] with a shotgun. . . I knowed Joe Albritton who was standing in front of the gate. . . My mother died instantly. She was shot in the back of the head. My mother was not trying to hurt Joe Albritton or harm him or anybody else at the time. . . I had no weapon in my hand. . . It was night when the shooting was done. It was a dark starlight night. It was after dark, an hour after sundown, I suppose. . . From where I was to the front gate it is about 12 or 15 steps. I recognized Joe Albritton as being one of the men outside of the gate in the dark. I have known him about six or seven years. . . I had seen him several times before the shooting that night about at different places. I saw him shoot my mother in the light on the front porch, when I recognized him on the porch. I recognized him standing outside, and he was standing in the yard when he shot. I had not said anything to him. I did not hear the sound of his voice on that night. . . The closest I got to him was when he shot my mother, he stepped over into the side of the yard not over 15 steps from the porch, and the porch was about eight feet wide, and when my mother fell she was close enough to the door for this part of her body to fall into the door. . . He got close enough for me to

know who he was. . . I saw Joe Albritton twice that night. That was the first time that I have ever seen him at night to know him. . . I saw Guy Long make the shot that struck this hand. Jack Long was the first one that shot me. Joe Albritton shot me. Joe Brown Kirkland shot in the house. I saw all four men do some shooting. I saw Joe Albritton standing in the porch from the firelight that was burning in the fireplace." The evidence authorized the inference that after the deceased was shot down some of those engaged in the shooting came into the house, and that it was at this time that John Scott from some point saw Joe Albritton "standing in the porch."

Ella Scott, the wife of John Scott, as a witness for the State, testified as follows: "The white men come in when I was trying to shut the door after Lucy Scott was shot. . . Mr. Joe Albritton come in the house behind Jack Long. . . He had a gun, I can't say what kind. . . Joe Albritton was the next man that came in the door after my mother-in-law was shot. . . Joe Albritton and Long did not remain in the room no longer than they could look in the room and under the bed. Jack Long and Joe Albritton looked for John under the bed and in the room, then Joe Albritton stepped in the porch and turned and went back to the light, and Jack Long went on out of doors and struck matches around out of doors. . . I had seen Joe Albritton before he stepped inside the doors. . . I have known Joe Albritton about a year. I knowed him about a year before the shooting. I do not know how many times I saw him during that year. . . I saw him three or four times before Lucy Scott was killed."

The defendant introduced in evidence portions of the testimony delivered by John Scott and Ella Scott at the commitment trial, whereby it was sought to impeach them as by contradictory statements. Several witnesses testified that because of the general bad character of John Scott they would not believe him on oath. The defendant contended and introduced evidence to show that he was at home at work during all of the afternoon before the homicide, and that he was not present at the time and place of the crime, but was attending a dance several miles away. Numerous persons who were present at this dance testified to having seen Joe Albritton there, some stating that he arrived at about 8 o'clock, and others fixing the time at from 8:30 to 9 o'clock. The defendant's state-

ment was in conformity to these contentions, whereby he denied all connection with the crime and asserted the defense of alibi. The credibility of the witnesses being a matter for the jury, the verdict was not unauthorized upon the ground that the witnesses who claimed to recognize the defendant Albritton at the scene of the crime could not have done so under the circumstances, or upon the ground that these witnesses were impeached by the other testimony. So also it was within the province of the jury to find against the defense of alibi, in view of all the evidence. The verdict was supported by the evidence, and the court did not err in refusing to grant a new trial upon the general grounds.

The special grounds of the motion for a new trial are dealt with in the headnotes, and elaboration is unnecessary. *Long* v. *State, 175 Ga.* 274 (165 S. E. 75), is a companion case.

*Judgment affirmed. All the Justices concur.*